## OUERBACKER v. HENDERSON COUNTY.

### No. 4886.

Circuit Court of Appeals, Fourth Circuit.

Feb. 23, 1942.

W. P. Sandridge, of Winston-Salem, N. C., and Richard M. Maxwell, of Atlanta, Ga. (Manly Hendren & Womble, of Winston-Salem, N. C., on the brief), for appellant.

Thomas H. Franks, of Hendersonville, N. C. (M. M. Redden, of Hendersonville, N. C., on the brief), for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

On May 27, 1941, Henderson County, North Carolina, filed a petition in the District Court alleging that it was unable to pay its debts as they matured and therefore desired to effect a composition with its creditors under Chapter 9 of the Bankruptcy Act, 11 U.S.C.A. § 401 et seq., in conformity with a plan submitted with the petition. No objection was made by any one save Mrs. Emma A. Ouerbacker, who owned less than one per cent of the indebtedness affected by the plan. The District Judge, after hearing the evidence and giving due consideration to the matter, passed an interlocutory decree on September 4, 1941, confirming the plan; whereupon the objector filed this appeal under Section 403, sub. e.

The plans filed with the petition had their origin under the following circumstances: On April 1, 1936, the county, being seriously in default and unable to meet its maturing obligations, proposed a plan for refunding its debts. The plan submitted to the creditors showed that the amount of the outstanding bonds to be refunded was $2,847,000, issued at various dates at interest rates on the several issues at figures ranging from 4¾ per cent to 6 per cent. The plan called for the issuance of refunding bonds under date of July 1, 1936, to mature in semi-annual serial installments from July 1, 1938 to January 1, 1968; the order of maturity did not follow the order of maturity of the bonds to be refunded. The refunding bonds were to bear interest at 2 per cent from July 1, 1936 to July 1, 1939; 2½ per cent from July 1, 1939 to July 1, 1942; 3 per cent from July 1, 1942 to July 1 1947; 4 per cent from July 1, 1947 to July 1, 1952, and the contract rates of interest in the original bonds thereafter. An exchange of the refunding bonds for the outstanding bonds, par for par, was contemplated; and the past due coupons and accrued interest, calculated on a basis representing 1¾ per cent annual interest on the outstanding bonds, were to be paid in cash upon the deposit of the bonds.

The plan was submitted to the creditors and was accepted by bondholders owning 98 per cent of the indebtedness; and the exchange of bonds took place. The only objector was Mrs. Ouerbacker who owned bonds of the par value of $25,000, and the remaining creditors, owning a little more than 1 per cent of the debt, were not heard from.

After operating under the plan for three years, the county defaulted in the payment of interest due July 1, 1940, at which time the funds on hand were not sufficient to meet the requirements. In the meantime, litigation had been instituted against the county seeking to compel it to assume the payment of certain School District Bonds in the sum of $355,000, of which $250,000 were in default. The county had constructed school buildings in many districts without expense to them, and it was urged as a matter of fairness that the county should also assume the payment of the bonds in question, and this the county agreed to do. On August 2, 1940, the appellant secured a judgment against the county on overdue coupons for $8,937.50 with interest.

In view of this situation, the county proposed a second plan supplemental to the first under date of September 1, 1940. The plan was first submitted in tentative form and approved by creditors holding 75 per cent of the bonds at a meeting at Asheville, North Carolina, on August 12, 1940. In the final form of the plan the bonded debt of the county was stated to be $2,876,627.50. From this total was deducted the sum of $238,627.50 representing certain School Funding and Funding bonds, payable from State Highway reimbursements contracts, leaving a balance of $2,638,000 for which it was proposed to issue refunding bonds to be exchanged, par for par, for the remaining county wide bonds outstanding as of July 1, 1940. The new bonds were to be

dated July 1, 1940, and were to mature on July 1, 1970, with interest at the following rates: 2½ per cent from July 1, 1940 to July 1, 1944; 3 per cent from July 1, 1944 to July 1, 1949; 3½ per cent from July 1, 1949 to July 1, 1954; 4 per cent from July 1, 1954 to July 1, 1959; 4½ per cent from July 1, 1959 to July 1, 1970.

The new refunding bonds were to be redeemable in the order of the identifying numbers at par and accrued interest on any interest payment date after the maturity dates of the bonds to be refunded. In order that the refunding bonds might be retired in the order of these maturities, it was arranged that the lowest numbered refunding bonds should be exchanged for the earliest maturing bonds to be refunded.

Unpaid July 1, 1940, interest coupons were to be paid in full by the depository upon the deposit of the bonds.

This plan was submitted to the bondholders on or about December 31, 1940. Acceptances of it had been received from the owners of 75 per cent of the bonds, and more than 66⅔ of the bonds had been deposited for exchange when the petition in bankruptcy was filed on May 27, 1941.

Both of the plans were prepared and submitted to the creditors with the approval of the Local Government Commission, a state body, clothed by statute, North Carolina Code of 1939, chapter 49B, § 2492(1) et seq., with power to pass on the necessity or expediency of bond issues by local governmental units. Under the statute, bond issues by local government units are invalid unless approved as to necessity or expediency by the Commission which also is clothed with power to sell municipal bonds, to exchange refunding bonds, adjust accrued interest, &c.

Both plans were formed with the assistance of the North Carolina Municipal Council, Inc., a non-stock, non-profit corporation organized to assist local governmental units to adjust their financial difficulties and to give information in regard to North Carolina municipal bonds to its members, such as banks, insurance companies and dealers in municipal bonds, who paid the organization an annual membership fee for this service. The county retained the Council to present the plans to its creditors without expense to the bondholders, and agreed to pay the Council for its services. The agreed reimbursement for services of the Council in connection with the first plan was an amount not to exceed 1 per cent of the par value of the bonds, and this fact was disclosed to the bondholders in the body of the plan. The agreed reimbursement of the Council for services in connection with the 1940 plan was a retainer of $500 and a fee of $1 for each $1,000 bond deposited under the plan. The fact that the Council had been employed to present the plan to the creditors at the expense of the county was disclosed in the plan. The proof showed that the Council made no profit under its two contracts with the county.

The petition in bankruptcy was filed as the final step of the county in refinancing its affairs, because it was desired to have confirmation of the refunding plans by the bankruptcy court so as to prevent any non-cooperative creditor from getting a preference. This fact was communicated to the creditors by the Board of County Commissioners by letter of May 23, 1941, in which reference was made to the acceptance of the holders of 98 per cent of the obligations of the county under the 1936 plan, and the acceptance by holders in excess of 72 per cent of the bonds included in the 1940 plans. The bondholders were requested to sign an acceptance to be filed in the District Court in connection with a petition in bankruptcy for a composition of the county's debt, in conformity with these plans. The North Carolina Municipal Council on May 27, 1941 also sent a letter to the bondholders to the same effect. The petition in bankruptcy was filed with the approval of the Local Government Commission, and the bondholders were asked to send their signed acceptances to it to be filed in the proceeding.

As only a few days had elapsed after the letter of May 23, 1941, was sent out, acceptance of the composition had been received from the holders of only $143,000 of bonds when the petition in bankruptcy was filed. The petition, however, alleged that the holders of 98 per cent in amount of the bonds had accepted the exchange of bonds and interest payment under the 1936 plan and that the holders of 66⅔ per cent in amount of the bonds had accepted the 1940 plan in writing; and there was appended to the petition what purported to be a list of all the known creditors, including therein a list of the holders of more than 66⅔ per cent of the bonds who had accepted the plan of composition.

This list consisted of the names of persons who had accepted the 1940 plan in the preceding months, and the statement was therefore inaccurate; for although the purpose of the composition was to secure the acceptance of the 1940 plan in bankruptcy, the signers listed had not endorsed the composition as such. Subsequently, written acceptance to the composition signed by the holders of more than 66⅔ per cent in amount of the bonds was received. A petition was filed by the county on July 14, 1941, in the proceeding, stating that the holders of more than 80 per cent of the bonds had accepted the composition plan in writing and that many desired an immediate exchange of the bonds so as not to be compelled to wait an indefinite time on account of a small recalcitrant minority. On that date the court issued an order authorizing the exchange to be made. By August 8, 1941, the holders of $2,457,250 or more than 93 per cent of the bonds had filed acceptances to the plan in composition; and additional acceptances were received prior to the passage of the interlocutory decree of September 4, 1941, whereby the plan was confirmed. By that date the holders of $2,121,000 of bonds out of a total of $2,638,000 had accepted the refunding bonds in exchange.

Many objections to the confirmation of the plan are raised by the appellant. It is said in the first place that the fundamental requisite for the composition of the indebtedness in bankruptcy was lacking because there was no showing that the county was insolvent or unable to pay its debts as they matured when the petition was filed. The tax levy of 1940 was not sufficient even to service the required principal and interest payments on the refunding bonds issued under the 1936 plan; and it is therefore argued that the county failed to make adequate use of its taxing power and deliberately precipitated the default upon which the petition for composition rests. But, the undisputed proof shows that the total taxable basis of the county in 1940 was $22,081,210; that the property valuations were on a high scale, and in most instances, far in excess of actual values; that in certain districts the property was subject not only to county but also to city and district taxes, which required an aggregate tax of between 3 and 4 per cent on the high valuations; that the county, in an effort to collect the taxes, had foreclosed on hundreds of pieces of property and taken title thereto, but the result had been to decrease rather than to increase tax collections; and that if the tax rate was made sufficient to meet the county's obligations under the 1936 plan and also the additional School District obligations, the tax would be doubled, additional properties would be taken over by foreclosure, and the resulting tax collections would be greatly reduced. This situation led the county to request the Local Government Commission to make a survey of the financial condition, and as the result of the investigation that followed, the 1940 plan was proposed with the approval of the Commission and accepted by the bondholders. Taking these facts into consideration, we conclude that the District Court was justified in its finding that the county was unable to meet its obligations as they matured, in that a tax levy sufficient for the purpose would result in decreased collections and the taking over of a large amount of property, whereby the financial structure of the county and the value of its securities in the hands of the bondholders would be impaired.

Next, it is urged that the petition was defective in that, while alleging that creditors owning 98 per cent of the debt had accepted an exchange of bonds under the 1936 plan, it did not state in the words of the Act that creditors owning not less than 51 per cent of the debt had accepted the plan in writing. The objection is technical in the extreme, since, as the appellant well knew, the plan had actually been accepted in writing by more than the required percentage. The point was not made in the District Court and as an amendment of the petition would readily have supplied the defect, nothing more need be said here.

The point was made in the District Court that the petition should be dismissed because creditors owning not less than 51 per cent in amount of the securities affected by the plan had not in fact accepted it in writing when the petition was filed. The reference is to the plan in composition and not to the plan of 1940; and the point has substance although the plan in composition is in effect the plan of 1940. It is not enough to show that at some time in the past a majority of the creditors have accepted a plan. It must appear that they have accepted it as a plan of composition to be filed in the bankruptcy proceeding. That this is the meaning of the provision

of Section 403 relating to the contents of the petition is supported by the report of the Committee on Judiciary of the House of Representatives of March 29, 1940, 76th Congress, which was filed when proposals to amend the Municipal Bankruptcy Act were under consideration. The Committee rejected a proposed amendment which provided that an acceptance of refunding bonds under an amicable refunding plan should constitute an acceptance of any plan in bankruptcy which might later be proposed by the debtor. The Committee was of the opinion that the time element was important in this connection, and that regardless of the terms and conditions of the plan previously accepted by the bondholders, and even regardless of whether the plan in bankruptcy is as favorable as the refunding plan previously accepted by the bondholder, the law should afford the bondholder the opportunity of accepting or rejecting the plan in bankruptcy at the time that it is submitted to him.

In the pending case this requirement was in the minds of the proposers of the plan for they sought and actually secured new acceptances of the plan in composition, although acceptances of the 1940 plan were already in hand. However, they did not wait to receive the new acceptances before filing the petition, and therefore did not comply with the requirements of the statute; and if a motion to dismiss the petition had been made before the acceptances were received, or if the deficiency had otherwise come to the attention of the District Judge, a dismissal of the petition would have been required. It is the duty of the District Judge under the statute to approve the petition if it is properly filed, but to dismiss it if it fails to comply with the statute. As it was, no objection on this score was made until the answer of the appellant was filed on July 26, 1941, and the motion to dismiss was not made until the final hearing on September 4, 1941; and, in the meantime, as we have seen, acceptances of the plan in composition had been received from the holders of more than 93 per cent of the bonds, that is, sufficient acceptances not only to support the petition, but also to justify the decree. Under the circumstances, we think that the District Judge properly refused the motion to dismiss. It must be borne in mind that the plan of composition was the same in effect as the 1940 plan which a short time

before had been presented to and accepted by the bondholders; and that the requirements of the Act had been met by the written acceptance of an overwhelming majority of the creditors, there being but one objector, and that the objection could have been met completely on September 4, 1941, merely by refiling the petition.

The point is also raised that the proceeding should have been dismissed because the petition was based on two refunding plans, that of 1936 and that of 1940. There is no merit in the objection. In effect, there was but one plan, that is, the plan of 1940, filed in the bankruptcy proceeding. The plan of 1936 was also included because it described the bonds to be refunded and because it was necessary, in order to place all the creditors on the same footing, to offer to the creditors who had not accepted the 1936 plan the same amount and kind of securities to which they would have been entitled if they had accepted the 1936 plan and had exchanged their bonds under its terms. The 1940 plan called for the payment in cash of all the unpaid July 1, 1940, interest coupons on the outstanding bonds, referring in this connection to the bonds issued under the 1936 plan, and the objector would have had an unfair advantage over the remaining bondholders if she had been paid the overdue interest on the original bonds held by her instead of the amount of interest payable to her if she had accepted an exchange under the plan of 1936.

The ex parte order of July 14, 1941, permitting the exchange of the bonds under the plan of composition before the plan was actually ratified, was in our opinion premature and improper; but as it turned out, no interested party was prejudiced by the action, and it furnishes no ground for reversing the decree.

The amount of acceptances is said to be less than the 66⅔ per cent necessary under the Act to support a confirmation of the plan. This contention is based on a calculation of the total debt arrived at by adding to the total debt the amount of the School District bonds in the sum of $355,-000, plus all overdue interest thereon. A sufficient answer is that the School District Bonds were not included in the plan of composition.

It is said that certain of the consents were invalid because they were not

signed by the owners of the bonds but by agents or trustees on behalf of the owners, without attaching copies of instruments of authority, signed by the owners. It is a sufficient answer to the charge that if all of these consents are eliminated, more than 66⅔ per cent of the debt would still be represented by valid acceptances. There is indeed no claim or proof that the agents or trustees referred to acted without actual authority; the opposite might be inferred from the filing of the securities with the acceptances. The effort of the objector is merely to show a failure to comply with the requirements of Section 403 which provide that where any committee, organization, group or individual shall assume to act on behalf of creditors, such committee, organization, group or individual shall first file with the court a list of the creditors represented and shall attach copies of the instruments in writing, signed by the owners of the bonds showing their authority. We have no occasion under the circumstances to decide whether this provision of the Act applies to the consents under consideration.

The assents given by the bondholders, who are members of the North Carolina Municipal Council, are attacked on the ground that it was acting in a dual capacity, on the one hand as the agent of the county to prepare the plan and present it to the bondholders for acceptance, and on the other, as the representative of its member bondholders to furnish them inside financial information. It is charged that this dual relationship was incompatible with the good faith in the offer and the acceptance of the plan which was required by Section 403, sub. e (5) of the statute. Reference is made to the decision of the Supreme Court in American Ins. Co. v. City of Avon Park, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91, in which an order confirming a plan of composition was set aside because of the failure of the fiscal agent, who solicited the acceptances on behalf of the city, to make full disclosure of the financial stake it had in the success of the plan. The principle is sound, but the facts affirmatively show that it was not violated in the solicitation of acceptances by the North Carolina Municipal Council in this case. Its employment at the expense of the county was disclosed on the face of both the 1936 and 1940 plans. Its organization to secure information for the holders of bonds issued by North Carolina government units was not secret, and any bondholder was at liberty to become a member and have the benefit of its services. No member of the Council received any profit or benefit from the employment of the Council by the county, or any benefit from the exchange of bonds under the plan, that was not disclosed by the plan and shared with all creditors alike. In fact, the non-member bondholders were saved the payment of membership dues. The finding of the District Judge to this effect was supported by the evidence.

The failure of the county to include the School District bonds in the plan is said to invalidate it on the ground that the partial composition of the debt of a governmental unit is not contemplated by the Act. Section 403, sub. d does not bear out this statement for it provides that it shall not be requisite to the confirmation of the plan that it be accepted by any class of creditors whose claims are not affected by the plan. The School District bonds are in a separate class, for it appears that the county has assumed the obligation to pay them, and the holders of the bonds have the right to look not only to the county but also to the School Districts themselves for payment. The 1940 plan states that the principal holders of Hendersonville Graded School District Bonds have indicated their willingness to accept refunding bonds bearing the same date, maturity and interest rates as the county refunding bonds provided by the plan, when the School District bonds are assumed by the county; and that the details of the assumption by the county of the District bonds will be presented in the form of a refunding plan at an early date.

The complaint is made that subsequent to the first default of the county on its bonds in 1932, the county purchased $132,-000 in amount of bonds at a cost of $74,-238.55, from certain bondholders during the period from July 1, 1933 to July 1, 1940, and this circumstance is cited as evidence of bad faith on the county's part, which invalidates the consent given to the plan by the sellers of the bonds. The record does not give the dates or prices or other details of these transactions; and although the objector was in possession of the information above set out, no attempt was made to develop it at the hearing. In view of these facts, the charge is unworthy of further consideration.

In further support of the charge that the plan is not fair and equitable and as additional evidence of bad faith, it is pointed out that the county proposes to issue 30 year bonds at interest rates beginning at 2½ per cent and increasing gradually to 4½ per cent annually, as indicated above, whereas with no greater annual tax levy for servicing the debt, the county could issue 50 year bonds bearing 4¾ per cent annually. Assuming the calculation to be correct, it does not follow that the longer term bond would have been more acceptable to the creditors, and certainly the proposal to issue the shorter term bonds is not of itself evidence of bad faith.

Two features of the plan upon which the objecting bondholder particularly relies as indicative of unfairness, are the flat rate interest upon the refunding bonds, and the county's privilege of redeeming the refunding bonds before their maturity in the order of their identifying numbers. The bonds to be refunded under the 1936 plan bore varying rates of interest ranging from 4¾ to 6 per cent annually; the objector's bonds bore 5½ per cent interest; and the acceptance in exchange of the refunding bonds at the same rate of interest imposed a greater reduction upon the holders of the bonds issued at the higher rates of interest. Furthermore, the identifying numbers of the refunding bonds were not fixed in the same order as the maturity dates of the bonds to be refunded under the 1936 plan; and hence the holders of such bonds maturing at the earlier dates do not necessarily receive refunding bonds redeemable at correspondingly earlier dates. The objector's bonds matured, $5,000 on January 1, 1944, $10,000 on January 1, 1945 and $10,000 on January 1, 1946. The identifying numbers of the bonds issued under the 1936 plan ran from No. 1 to No. 1947. The bonds offered to the objector were numbered between 569 and 599. Consequently they will be subject to redemption at a comparatively early date; but as the identifying numbers of the bonds issued under the 1936 plan were not arranged in the order of the maturities of the bonds to be refunded, some of the bondholders will receive bonds that will be subject to redemption before the bonds to be issued to the objector although maturing at later dates than the bonds held by her.

These features unquestionably involve a failure to preserve certain advantages possessed by certain of the holders of the bonds to be refunded, but we cannot say that on this account the conclusion of the District Judge must be reversed, in holding that the plan is fair, equitable and for the best interests of the creditors, and does not discriminate unfairly in favor of any creditor or class of creditors. The discrimination, such as it is, does not go to the essence of the plan, and it affects other bonds of earlier maturities and high rates of interest, as well as those of the appellant. The plan met the approval not only of the District Judge, but also the approval of the Local Government Commission, an official administrative body charged with the duty of considering the interests of the governmental units and the holders of their obligations. Most significant in this connection is the approval of more than 93 per cent of the creditors, indeed the approval of all of the creditors that have been heard from, except the appellant. While the acceptance of a plan of composition by holders of a great majority in amount of the obligations affected by the plan is not the exclusive test of compliance with the statutory standard, American Ins. Co. v. City of Avon Park, 311 U.S. 138, 148, 61 S.Ct. 157, 85 L.Ed. 91, it is persuasive evidence that the court may consider. In re James Irr. Dist., D.C. S.D. Cal., N.D., 25 F.Supp., 974; In re Merced Irr. Dist., D.C. S.D. Cal. N.D., 25 F.Supp. 981; In re Lindsay-Strathmore Irr. Dist., D.C. S.D. Cal. N.D., 25 F.Supp. 988.

We reach the conclusion, after a consideration of all the arguments which the sole objecting bondholder has taken great pains to offer, that the case is of the precise kind that the Municipal Bankruptcy Act was intended to meet, to the end that the efforts of a municipality and its creditors cooperating in good faith to readjust its financial difficulties will not be defeated without good cause by a recalcitrant minority, no matter how persistent. In line with the conclusions that we have reached are two recent cases in the Ninth Circuit: Taylor v. Provident Irrigation District, 123 F.2d 965; McDonald v. Banta Carbona Irrigation District, 123 F. 2d 968.

Affirmed.